UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEWART TITLE GUARANTY CO. | : | **CIVIL NO. 4:12-CV-00770** |
| | : | |
| Plaintiffs | : | (Chief Judge Kane) |
| | : | |
| v. | : | (Magistrate Judge Schwab) |
| | : | |
| OWLETT & LEWIS, P.C., | : | |
| | : | |
| Defendant | : | |

## ORDER
July 18, 2013

## I. Introduction.

This matter comes before the Court on defendant's motion for an order
directing the return of documents that defendant previously produced to plaintiff but
now seeks to claw back. Specifically, the defendant produced a mediation memo
and a consulting expert's report in discovery and contends that the documents are
privileged and were inadvertently produced. In deciding this dispute, and in the
absence of a rule applicable to the inadvertent disclosure of confidential mediation
documents and a non-testifying expert report, we find Federal Rule of Evidence
502(b) applicable by analogy. F.R.E. 502(b) provides that if the producing party
took reasonable steps to prevent disclosure and reasonable steps to rectify the
disclosure, the producing party does not waive the attorney-client privilege or

work-product protection by an inadvertent disclosure. Applying the F.R.E. 502(b) analysis, here, we conclude that, although the defendant inadvertently produced the mediation memo and expert report, the defendant waived any privilege applicable to those documents by failing to take reasonable steps either to prevent disclosure or to rectify the disclosure. Nevertheless, because the plaintiff has stated that it is willing to return the mediation memo to the defendant, we will order that the plaintiff do so. We will not, however, strike the deposition testimony that the plaintiff has already elicited based on the mediation memo and expert report. Nor will we direct the return of the expert report. And so we will grant in part and deny in part the currently pending motion for return of documents.

## II. Background and Procedural History.

### A. Present Complaint.

In April of 2012, the plaintiff, Stewart Title Guaranty Company, began this action against defendant, Owlett & Lewis, P.C., and, in March of 2013, Stewart Title filed an amended complaint. Stewart Title alleges the following facts in the amended complaint.

Stewart Title is a Texas corporation in the business of underwriting title insurance commitments and policies throughout the United States. Stewart Title

alleges that Owlett is a Pennsylvania professional corporation and, at all relevant times, Owlett was a licensed title agent in the Commonwealth of Pennsylvania performing legal services for Stewart Title including performing title searches and issuing title commitments and policies on behalf of Stewart Title.   Stewart Title alleges that the amount in controversy exceeds $75,000, and it invokes this court's diversity jurisdiction.

Stewart Title alleges that, in 1993, it entered into a retainer agreement with Owlett whereby Stewart Title retained Owlett as its attorney and appointed Owlett as its limited agent to examine titles and issue title policies covering property in Tioga County, Pennsylvania.   The retainer agreement required Owlett to issue title policies according to recognized underwriting practices, the rules and instructions of Stewart Title, and the rules and regulations of the Department of Insurance.   The retainer agreement also prohibited Owlett, without prior written consent, from issuing "title policies without appropriate exceptions as to liens, defects, encumbrances, and/or objection disclosed by a careful search and examination of title, or known to [Owlett] to exist" and from insuring "over a title defect, lien, or encumbrance, regardless of any indemnity or deposit that [Owlett] shall obtain." *Doc. 19* at ¶¶14-15.   The retainer agreement also provided that Owlett generally shall be liable to Stewart Title for any loss including losses resulting from errors in abstracting, errors in examining title, and

errors in closing transactions as well as losses resulting from violations of the retainer agreement and the instructions given by Stewart Title.

In December of 2010, Stewart Title and Owlet executed a termination agreement providing that, effective February 8, 2011, the retainer agreement would be of no further force and effect, but the parties agreed that any pre-existing obligations of Owlett would survive the termination of the retainer agreement.

On September 30, 2005, John and Brenda Goldian purchased property consisting of 70 acres located in Tioga County, Pennsylvania in the Marcellus Shale Formation. According to Stewart Title, during the last half of the Nineteenth Century and first half of the Twentieth Century, it was common and customary practice for property owners in this region to reserve all, or a portion, of the oil, gas, and mineral rights when conveying property or to convey or assign those rights separate from the surface rights to the property. As a result of that practice, Stewart Title alleges that many record owners of property in the region do not own all, or even a portion, of the mineral rights to their properties. While in areas outside this region, it is common practice in the title industry for title agents to do title searches going back 60 years, according to Stewart Title, title agents know, or through reasonable diligence should know, that in this region such a 60-year search would be inadequate or insufficient to uncover instruments reserving, conveying, or assigning mineral rights because such

instruments were likely recorded more than 60 years ago. So, Stewart Title contends, a title agent in this region is required either to search and examine title to both the surface and the subsurface rights through the last half of the Nineteenth Century or to except mineral rights from the scope of coverage under any title insurance policy the agent issues.

Owlett performed the title work and conducted the settlement on the Goldians' purchase of the property, but Owlett conducted only a 60-year search. Owlett issued a title insurance policy underwritten by Stewart Title to the Goldians insuring fee simple title to the property including all of the mineral rights.

In three separate transactions in 1932, the Goldians' predecessors-in-title to the property conveyed 75% of the mineral rights to the property, and none of the subsequent purchasers of the property reacquired those mineral rights. So, when the Goldians purchased the property in 2005 they obtained only the surface rights to the property and 25% of the mineral rights. According to Stewart Title, in 2007, the Goldians, apparently unaware that they owned only 25% of the mineral rights, entered into a lease agreement with Chesapeake Appalachia LLC for the mineral rights to the property for a period of five years. Pursuant to the lease agreement, the Goldians were to receive a signing bonus of $8,902.50 as well as royalty payments for any oil or gas discovered under their property. Chesapeake, however, later discovered that the

Goldians held title to only 25% of the mineral rights to the property, and as a result, Chesapeake reduced the payments under the lease to the Goldians accordingly.

Stewart Title alleges that, in May of 2008, the Goldians submitted a title claim under the policy issued by Owlett, and Stewart Title paid the Goldians $306,676.88, an amount which represents, among other things, the difference between the appraised value of the property with and without the missing mineral rights. Stewart Title also allegedly incurred attorney's fees and costs in the amount of $7,810.70 in connection with the Goldians' title claim.

Stewart Title claims that, as a result of the Goldians' title claim, it incurred a loss as defined in the retainer agreement, and in accordance with the retainer agreement, Stewart Title demanded that Owlett indemnify and reimburse it for that loss. Owlett failed and refuse to do so, and so Stewart Title filed this action claiming that Owlett breached the retainer agreement. On April 1, 2013, Owlett filed an answer to the amended complaint.

On April 2, 2013, Owlett filed a motion for an order directing the return of documents inadvertently produced in discovery, which has been fully briefed. On June 5, 2013, the Court held a hearing on the motion, which is ripe for disposition on the merits.

**B. Pending Motion for Return of Documents.**

The pending motion concerns a mediation memo that Owlett provided to Stewart Title during discovery in this action.   Although the motion addresses the mediation memo, during briefing and the hearing on the motion, the focus of the dispute shifted from the mediation memo itself to an expert report which was attached to the mediation memo and which was also separately produced in discovery.

**1. The Lee Report and the State Mediation.**

In January of 2012, Owlett and the Goldians engaged in mediation of the state-court case, and Owlett submitted the mediation memo, which quoted the Lee Report, to the mediator.   That report, dated September 17, 2010, contains the following disclaimers or reservations:

> Though the opinions I express herein are made with a reasonable degree of legal certainty, this is my preliminary report and thus, the opinions expressed herein could change upon my receipt of additional documents, facts or information.
> Because this constitutes my initial preliminary report, it is being issued subject to Pa.R.C.P. 4003.3 (last sentence), and, at your instructions, can be revised later for purposes of an expert report in regard to my success as an expert witness.   A more detailed report with exhibits will be issued in the near future.

*Doc. 28-4* at 2.

## 2. Production of the Mediation Memo and the Deposition of Samantha Wilcox.

According to Stewart Title, on October 25, 2012, in response to document requests, Owlett produced two gussets[1] of documents, which included the mediation memo and the expert report. Although Owlett produced the mediation memo in October of 2012, as part of its responses to Stewart Title's requests for the production of documents, it was not until March of 2013, that Owlett became aware that it had produced the memo. On March 15, 2013, Stewart Title took the deposition of Samantha Wilcox, Esquire, an attorney with Owlett. During the course of that deposition, counsel for Stewart Title questioned Wilcox about a mediation memo that had been prepared in connection with a mediation of a separate state-malpractice action by the Goldians against Owlett.[2] More specifically, Stewart Title questioned Wilcox about statements made in a report of Kenneth W. Lee, which statements were quoted in the mediation memo. The transcript of the deposition reveals the following exchange between counsel and the following testimony by Wilcox regarding the mediation memo and the Lee Report:

> (Confidential Mediation Position Statement of Defendants marked as Deposition Exhibit 14)
> MR. SCHWARTZ: Before you ask any questions, let me just

---

[1] At the hearing, it became clear that what counsel for Stewart Title refers to as gussets are expandable file folders.

[2] That action has since been settled.

pose an objection to the exhibit, the fact that it was submitted confidentially in a mediation format.   I'm not sure how or why it was disclosed, but . . .

MR. COUGHLIN:    It was provided to me as part of discovery.

BY MR. COUGLIN:

Q:   Ms. Wilcox, I'm showing you what's been marked as Exhibit 14, which is entitled "Confidential Mediation Position Statement of Defendants," and do you recognize this document?

A.   Yes.

Q.   Have you seen it previously?   Obviously, if you recognize it, you've seen it previously.

A.   I've seen it.

Q.   And this was a document that was submitted in connection with the Goldians' malpractice action against the firm and yourself and Tom Owlett?

A.   Correct.

Q.   If you could turn to page 5, at the very bottom, the paragraph that starts "inasmuch," do you see that?

A.   Yes.

Q.   Starting with the second sentence in that paragraph, it says: "As noted in Mr. Lee's report, the presence of the Marcellus Shale natural gas deposits in Tioga County has long been known.   In 2002, the U.S. Geological Survey publicized reports of the existence of two trillion cubic tons of natural gas in the Marcellus Shale region.   Tioga County, and thus the Goldians' property, falls squarely within this region.   While the ability to extract natural gas from the shale deposits initially was problematic, given the depth of the natural gas deposits and the extraction costs, by 2005 the first successful gas well in the region began operating.   By the end of 2007, the Commonwealth had issued more than 375 well drilling permits, including many in Tioga County.   Thus, with even the modest exercise of due diligence (e.g., simply reading a newspaper), the Goldians should have known they potentially were sitting on natural gas deposits."

Did I read that correctly?

A.   Yes.

Q.   Any your counsel submitted this to the court in the malpractice area—in the malpractice action?

MR. SCHWARTZ: Objection.   It was never submitted to the

court. It was confidentially submitted to the mediator.

    MR. COUGHLIN: Who was the mediator?

    MR. SCHWARTZ: Tom Helbig, H-e-l-b-i-g.

    MR. COUGHLIN: Was he a private mediator?

    MR. SCHWARTZ: Yes.

    BY MR. COUGHLIN:

    Q. I stand corrected. Do you understand that this was submitted by your counsel confidentially to a private mediator?

    A. If he says it was.

    Q. You have no reason to believe that he's mistaken?

    A. Correct.

    Q. Do you agree with the statement contained in the—that I just read?

    A. What do you mean, do I believe in it?

    Q. Do you agree with it? Do you believe it to be accurate?

    A. Yes.

    Q. Now, it makes reference to a Dr. Lee. I'm sorry, Mr. Lee. Do you see that?

    A. Yes.

    Q. Who is Mr. Lee?

    A. I have no idea.

    Q. Do you know if he was an expert retained on your behalf in the malpractice action?

    A. I'm not sure.

*Doc. 28-3* at 17-18.

After the deposition, Owlett contacted Stewart Title seeking return of the

mediation memo, but at that time Stewart Title refused to return the memo.

### 3. The Parties' Contentions.

Owlett contends that the mediation memo is privileged under 42 Pa.C.S.

§ 5949, and, in its motion, Owlett seeks an order requiring Stewart Title to return the

mediation memo and precluding Stewart Title from using or referring to the memo in any manner in any future proceedings in this case including, as we understand Owlett's request, any use of the deposition testimony of Wilcox about the memo.

According to Owlett, the mediation memo contains the word "Confidential" and an introductory statement that provides that the memo is submitted for the purposes of settlement only. Owlett contends this put Stewart Title on notice of the confidential nature of the memo and that Stewart Title should have known that the memo was mistakenly produced. Owlett further contends that the disclosure of the mediation memo was inadvertent and did not waive the mediation privilege. In that regard, Owlett contends that it took the following precautions to protect the confidential nature of the memo: it labeled the memo confidential; it objected to use of the memo at Wilcox's deposition; and it asked for the return of the memo immediately after the deposition.

In its brief in opposition to the motion, Stewart Title agrees to return the mediation memo. But it disagrees with any suggestion that the deposition testimony of Wilcox regarding her agreement with the statement from the memo taken from the Lee Report is inadmissible. Stewart Title argues that Pennsylvania's mediation privilege does not apply to documents or submissions that existed prior to mediation or independent of mediation, and, according to Stewart

Title, since the Lee Report was created independent of the mediation, it is not protected by the mediation privilege. And so, Stewart Title contends, Wilcox's deposition testimony regarding her agreement with statements made in the Lee Report should not be stricken.

While acknowledging that he questioned Wilcox at her deposition about the summary of the Lee Report in the mediation memo, Stewart Title's counsel contends that his line of questioning at Wilcox's deposition would have been no different had he presented Wilcox with the Lee Report itself, instead of the mediation memo. In fact, counsel contends that although he had another copy of the Lee Report, he did not question Wilcox directly about the report because such questioning would have been duplicative of his questions to Wilcox about the summary of the report in the mediation memo. Counsel contends that to the extent that the court determines that Wilcox's testimony about her agreement with the summary of the Lee Report contained in the mediation memo is inadmissible, he will seek to redepose Wilcox and question her directly about the Lee Report.

With Stewart Title's agreement to return to the mediation memo, the focus of the dispute shifted to the Lee Report. In its reply brief, Owlett asserts that the Lee Report was an exhibit to the mediation memo and produced solely for the purpose of

mediation.   Owlett also asserts that the report was a report from a consultant and was not disclosed in the state-court litigation, and Stewart Title would not have had access to the Lee Report absent the inadvertent disclosure of the mediation memo. And so Owlett contends that the Lee Report is protected from disclosure by Pa.R.Civ.P. 4003.5(a)(3).

Stewart Title requested and received leave to file a surreply brief, and in that brief, Stewart Title points out that Owlett produced the Lee Report in two separate forms as part of the discovery in this case: (1) as an exhibit to the mediation memo; and (2) separately in a subfolder titled "TUCKER/ARENSBERG REPORT—Defense Expert." *Doc. 32-1* at 2-9.   Stewart Title asserts that Owlett's contention that Lee was merely a consultant is disingenuous as the subfolder indicates that Lee was a defense expert.   Therefore, according to Stewart Title, Pa.R.Civ.P. 4003.5(a)(3) does not apply.    Stewart Title further contends that even if the Lee Report were protected from discovery in the underlying litigation by Pa.R.Civ.P. 4003.5, Owlett waived that protection by producing the report in two separate forms in this case.

## C. The Hearing.

The court held a hearing on the motion for return of documents on June 5, 2013. The only witness to testify at the hearing was Edwin A.D. Schwartz, Esquire, counsel for Owlett. He testified about his general practice in responding to discovery requests. In that regard, he testified that when he gets a discovery request, he goes through it to see if there is anything objectionable in the request, and then he asks his paralegal to go through the file and pull out any "traditionally privileged documents, communications [he] may have had internally in the firm regarding the file assessment, invoices, [and] privileged communications with the clients." *Doc. 37* at 15. He testified that after the paralegal goes through the file, the paralegal copies the remaining documents and then prepares a transmittal letter. Schwartz testified that he then thumbs through the documents to "make sure that there are no letters from [him] to . . . the clients or anything that [he] would consider privileged." *Id.* He candidly characterized his review as "cursory." *Id.*

Schwartz also testified about the production of documents in this case. He testified that in this case he produced six to eight inches of documents. He testified that he became aware of the disclosure of the mediation memo at the Wilcox deposition and he objected, and after the deposition he asked Stewart Title to return the mediation memo and attachments.

14

Schwartz further testified about the Lee Report. He testified that there were problems with the report and that he did not agree with the report in some aspects. But, he testified, at the time of the state mediation that is all he had, and although he submitted it to the mediator, he informed the mediator that Owlett would be getting a different expert. He testified that he did not intend to use Lee as an expert at the state-malpractice trial. On cross examination, he admitted that there was nothing in the folder labeled "TUCKER/ARENSBERG REPORT—Defense Expert," a copy of which was produced to Stewart Title during the document production in this case, that would indicate that Lee was merely a consultant. Accordingly, Owlett argued for the return of the documents on the basis that it inadvertently disclosed the Lee Report as well as the mediation memo.

## III. Discussion.

The court engages in a two-step process to determine whether inadvertently produced documents should be returned: (1) we determine whether the documents are privileged; and (2) if the documents are privileged, we determine whether the party that produced the documents waived the privilege. *Peterson v. Bernardi,* 262 F.R.D. 424, 427 (D.N.J. 2009). And so, in this case, we begin by analyzing whether

the mediation memo and the Lee Report and privileged, and then we turn to the question of waiver.

## A. Privilege and the Mediation Memo.

Owlett contends that the mediation memo is privileged under Pennsylvania's mediation privilege. 42 Pa.C.S.A. § 5949(a) sets forth the general rule that all communications and mediation documents are privileged:

> Except as provided in subsection (b), all mediation communications and mediation documents are privileged. Disclosure of mediation communications and mediation documents may not be required or compelled through discovery or any other process. Mediation communications and mediation documents shall not be admissible as evidence in any action or proceeding, including, but not limited to, a judicial, administrative or arbitration action or proceeding.

Section 5949(b) sets forth several exceptions to the general rule, one of which provides that "[a]ny document which otherwise exists, or existed independent of the mediation and is not otherwise covered by this section, is not subject to this privilege." 42 Pa.C.S.A. § 5949(b)(4).

Federal Rule of Evidence 501 provides that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." This case is a breach-of-contract action brought under the court's diversity jurisdiction. As such, Pennsylvania law supplies the rule of decision and governs the privilege issue. So, we look to Pennsylvania's mediation privilege and,

although Owlett also mentions a federal mediation privilege, we need not, and do

not, determine whether such a federal privilege exists or, if it does, the contours of

such a privilege.[3]

We conclude that the mediation memo is privileged under Pennsylvania's

mediation privilege because the memo was prepared for and used in the mediation of

the state-malpractice action.

**B.  Privilege and the Lee Report.**

The Lee Report, which was prepared 16 months prior to the mediation,

is not protected by Pennsylvania's mediation privilege because it existed

independent of the mediation. *See* 42 Pa.C.S.A. § 5949(b)(4).   Nevertheless,

Owlett contends that, since Lee was merely a consultant, his report is

protected from discovery by Pa.R.Civ.P. 4003.5(a)(3), which provides:

> A party may not discover facts known or opinions held by an
> expert who has been retained or specially employed by another
> party in anticipation of litigation or preparation for trial and who is
> not expected to be called as a witness at trial, except a medical
> expert as provided in Rule 4010(b) or except on order of court as

---

3   While some courts have recognized a federal mediation privilege, *see Sheldone
v. Pa. Turnpike Comm'n,* 104 F.Supp.2d 511, 515 (W.D.Pa. 2000), other courts have
questioned whether there is such a privilege, *see Molina v. Lexmark Intern., Inc.,*
No. CV 08-04796, 2008 WL 4447678 (C.D.Cal. Sept. 30, 2008)(citing cases).   We
are not aware of any case in this court or the Third Circuit that has explicitly adopted
such a privilege.

to any other expert upon a showing of exceptional circumstances
under which it is impracticable for the party seeking discovery to
obtain facts or opinions on the same subject by other means,
subject to such restrictions as to scope and such provisions
concerning fees and expenses as the court may deem appropriate.

Although, in accordance with F.R.E. 501, we apply Pennsylvania law to

questions of privilege in this case, Owlett has not provided any argument or

authority for this court to apply a Pennsylvania discovery rule in this case.   In any

event, Pa.R.Civ.P. 4003.5(a)(3) is materially the same as Fed.R.Civ.P. 26(b)(4)(D),

which provides:

Ordinarily, a party may not, by interrogatories or deposition, discover
facts known or opinions held by an expert who has been retained or
specially employed by another party in anticipation of litigation or to
prepare for trial and who is not expected to be called as a witness at
trial. But a party may do so only:
**(i)** as provided in Rule 35(b)[4]; or
**(ii)** on showing exceptional circumstances under which it is
impracticable for the party to obtain facts or opinions on the same
subject by other means.

Given Schwartz's testimony that he did not intend to call Lee as an expert at

the state-malpractice trial, we assume for the sake of argument that, absent waiver,

the Lee Report would not be discoverable.

---

[4] Rule 35, which deals with physical and mental examinations, is not applicable in
this case.

## C. Waiver Analysis.

Having determined that the mediation memo is privileged and that the Lee Report is protected from discovery, we now turn to the question whether Owlett waived any privilege or protection from discovery by disclosing the mediation memo and the Lee Report during discovery in this case.

In the context of the attorney-client privilege, prior to the adoption of F.R.E. 502 in 2008, there were three distinct schools of thought regarding whether an inadvertent disclosure waived the privilege. At the ends of the continuum, some courts held that an inadvertent disclosure waived the privilege, while other courts adopted a no-waiver rule. *See Koch Materials Co. v. Shore Slurry Seal, Inc.,* 208 F.R.D. 109, 117 (D.N.J. 2002). Many courts, however, took a middle-ground approach and examined "the following factors to determine whether a document has lost its privilege through inadvertent disclosure: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) any delay and measure taken to rectify the disclosure; and (5) whether the overriding interests of justice would or would not be served by relieving the party of its error." *United States v. Keystone Stanitation Co., Inc.,* 885 F.Supp. 672,

676 (M.D.Pa. 1995)(Rambo, J.); *see also Sampson Fire Sales, Inc. v. Oaks,* 201

F.R.D. 351 (M.D.Pa. 2001)(Mannion, M.J.).

Federal Rule of Evidence 502(b), which adopted the middle-ground approach,

sets forth the conditions for when a disclosure of a communication or information

covered by the attorney-client privilege or the work-product doctrine does not result

in waiver of the privilege:

> **(b) Inadvertent Disclosure.** When made in a federal
> proceeding or to a federal office or agency, the disclosure does not
> operate as a waiver in a federal or state proceeding if:
> **(1)** the disclosure is inadvertent;
> **(2)** the holder of the privilege or protection took reasonable steps
> to prevent disclosure; and
> **(3)** the holder promptly took reasonable steps to rectify the error,
> including (if applicable) following Federal Rule of Civil
> Procedure 26(b)(5)(B).[5]

---

5 Fed.R.Civ.P. 26(b)(5)(B), in turn, provides:

> If information produced in discovery is subject to a claim of
> privilege or of protection as trial-preparation material, the party making
> the claim may notify any party that received the information of the
> claim and the basis for it. After being notified, a party must promptly
> return, sequester, or destroy the specified information and any copies it
> has; must not use or disclose the information until the claim is resolved;
> must take reasonable steps to retrieve the information if the party
> disclosed it before being notified; and may promptly present the
> information to the court under seal for a determination of the claim.
> The producing party must preserve the information until the claim is
> resolved.

The party asserting privilege has the burden of proving that the documents are privileged and of proving the elements of F.R.E. 502(b). *Peterson, supra,* 262 F.R.D. at 427. Although F.R.E. 502(b) only expressly applies to the attorney-client privilege and to work-product protection, by analogy, the principles that it sets forth are also applicable to other privileges, and so we will apply those principles in this case to determine whether Owlett has waived the privilege and protection applicable to the mediation memo and the Lee Report.

The first prong of the waiver analysis is whether the disclosure of the mediation memo and Lee Report were inadvertent. There was no testimony, or any basis to conclude, that the disclosures in this case were intentional or strategic. Rather, they were the result of counsel's failure to conduct a thorough review of the documents before producing them. Accordingly, we conclude that the disclosures were inadvertent. *See Sampson Fire Sales, supra,* 201 F.R.D. at 361 ("By its very nature, an *inadvertent disclosure* means that the party is unaware that they have sent the privileged communication to an adversary or someone who would not be entitled to review it.")(emphasis in original).

The second prong of the waiver analysis is whether Owlett took reasonable steps to prevent disclosure. We conclude that Owlett has not met this requirement. Counsel's review of the documents before production was cursory, and even that

cursory review was focused on traditionally privileged documents.[6]   There is no

evidence that any review whatsoever was conducted for other types of privileged

documents, such as the mediation memo.   Further, while Owlett points to the fact

that the mediation memo contains the word "Confidential" and a statement that the

memo is submitted for the purposes of settlement only, the designation of the memo

as confidential was made when the memo was created.   There is no evidence that

during the production in this case the memo was stamped, or in any other manner

marked or segregated, as privileged and then mistakenly included in the documents

produced.   In fact, there was no testimony that any steps were taken in this case to

protect the memo from disclosure, and despite the memo's original designation as

confidential, it was produced in this case.   Further, the Lee Report was produced in

two separate forms—as an attachment to the mediation memo and again on its own

as an expert report.   This case, unlike many others where the waiver issue has been

addressed, did not involve a large number of documents, and there was no evidence

that counsel was under significant time constraints with respect to the production of

documents.   Given the relatively small number of documents produced in this case,

---

[6] Schwartz testified that his normal practice was to ask his paralegal to go through
the file for traditionally privileged documents.   Although it is not entirely clear
what he meant by traditionally privileged documents, from the context of his
testimony it is reasonable to assume that he meant documents protected by the
attorney-client privilege and possibly by the work-product doctrine.

counsel for Owlett should have been able to easily identify the documents as privileged had he taken reasonable steps to prevent disclosure of privileged materials.

The third prong of the waiver analysis is whether Owlett took reasonable steps to rectify the disclosures. Owlett's actions in this regard were also not reasonable. After the Wilcox deposition, Owlett asked Stewart Title to return the mediation memo. Owlett, however, could have taken steps at the Wilcox deposition to prevent the use of the mediation memo. Although counsel for Owlett raised an objection at the deposition based on the fact that the memo was submitted confidentially in a mediation format, he never specifically objected on the basis that the memo was privileged. In accordance with Fed.R.Civ.P. 30(c)(2), an attorney may instruct a deponent not to answer when necessary to protect a privilege, and so Owlett could have instructed Wilcox not to answer questions about the mediation memo and could have attempted to get the court on the phone to resolve the issue at that time. If it had done so, not only could the court have addressed the issue with regard to the mediation memo, but the issue with regard to the Lee Report would then also have been brought to light and could have been addressed at that time. Instead, although Owlett made a nonspecific objection to the mediation memo, no objection at all was made to the underlying Lee Report at the deposition.

Moreover, even after the deposition the defendant did not take any steps specifically as to the Lee Report. The Explanatory Note to F.R.E. 502(b) provides:

> The rule does not require the producing party to engage in a post–production review to determine whether any protected communications or information has been produced by mistake. But the rule does require the producing party to follow up on any obvious indications that a protected communication or information has been produced inadvertently.

Thus, while the defendant did not have a duty to do a post-production review, once the defendant was aware that the mediation memo was inadvertently disclosed, it would have been reasonable for the defendant to try to determine whether any other documents were inadvertently disclosed.

In sum, we conclude that, although Owlett inadvertently produced the mediation memo and the Lee Report, it did not take reasonable steps to prevent disclosure of privileged documents, and it did not take reasonable steps to rectify its errors. Accordingly, Owlett waived the privilege applicable to the mediation memo and the Lee Report. Nevertheless, because Stewart Title agreed to return the mediation memo, we will direct that it do so. We will not, however, strike the deposition testimony of Wilcox or order the return of the Lee Report.

**IV. Order**.

Accordingly, for the foregoing reasons, **IT IS ORDERED** that Owlett's motion (doc. 24) for an order directing the return of documents inadvertently produced in discovery is **GRANTED IN PART AND DENIED IN PART.** The motion is granted to the extent that Stewart Title is directed to return the mediation memo to Owlett and, other than the Wilcox-deposition testimony, to not use the mediation memo in any further manner. The motion is otherwise denied.

_**S/Susan E. Schwab**_
Susan E. Schwab
United States Magistrate Judge